SQUIRE PATTON BOGGS
Attorneys for Plaintiff
30 Rockefeller Plaza
New York, New York 10112
212.872.9800
Douglas R. Burnett, Esq. (DB 7616)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
TATA COMMUNICATIONS (BERMUDA) Limited.,

                 Plaintiff,

    -against-

MSC MAYA, HER ENGINES, TACKLE, ETC, IN
REM; and MEDITERRANEAN SHIPPING COMPANY
(MSC) SA, and UDAL CORPORATION, both IN
PERSONAM,

                Defendants.
-----------------------------------------------------------------x

**VERIFIED**
**COMPLAINT**

      Plaintiff, TATA COMMUNICATIONS (BERMUDA) Limited, ("Plaintiff" or "TATA")
by their attorneys, SQUIRE PATTON BOGGS, for their Complaint against Defendants, MSC
MAYA, HER ENGINES, TACKLE, ETC, IN REM; and MEDITERRANEAN SHIPPING
COMPANY (MSC) SA, and UDAL CORPORATION, both IN PERSONAM, state as follows:

A. Jurisdiction and Venue

    1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a maritime tort claim for damage by the

defendants of a submarine cable. This case also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333; the Court's federal question jurisdiction pursuant to 28

U.S.C. §1331; and the Court's jurisdiction under the Submarine Cable Act, 47 U.S.C. § 33.

    2.      Venue lies within this District under the provisions of 28 U.S.C. § 1391.

B. The Parties

3.      Plaintiff Tata Communications (Bermuda) Limited (Tata), a Bermuda corporation, is the owner of the Tata Gulf Cable System (TGCS) and has its principal office at Clarendon House, 2 Church Street, Hamilton, Bermuda.

4.      Defendant MSC Maya. IMO # 8714190, is a 43184 deadweight ton container ship, built in 1988, flying the flag of Panama, and has made several port calls in New York City.

5.      Defendant Mediterranean Shipping Company (MSC) SA (MCS), a foreign corporation, with an office at Chemin Rieu, 12-14, 1208, Geneva, Switzerland, is the beneficial owner and commercial operator of the MSC Maya.

6.      Defendant Udal Corporation, a foreign corporation, with an office care of MSC Mediterranean Shipping Co SA, Chemin Rieu, 12-14, 120 Geneva, Switzerland, is the registered owner of the MSC Maya.  Collectively, the Defendants are referred to as the "vessel interests" in this complaint.

C.      Substantive Facts Surrounding This Cause of Action

7.      The Tata Gulf Cable System (TGCS) is a 2036 km international submarine fiber optic cable system owned by Tata Communications that lands in the Arabian Gulf at Qalhat, Oman, Kalba, U.A.E., Dubai, U.A.E., Amwaj Islant, Bahrain), Sumaysimah, Qatar, and Al Khobar , Kingdom of Saudi Arabia.  Through other connecting submarine cables systems it carries voice, data, video and internet communications traffic to and from the United States and other nations.

8.      At 1735 GMT on 6 January 2014, TGCS suffered two faults.  The cable faults in Segment 6 (BU#03) of TGCS are located initially at approximately, 25°04.825' N, 54°52.835' E (fault 1) and 25°04.837' N, 54°50.776' E (fault 2), in international waters, about 46 km from the Dubai Terminal.

~2~

9.      Pursuant to a standing private maintenance agreement for TGCS with E-Marine, the U.A.E. flag cable ship CS Niwa was mobilized to sail to the fault location to carry out an emergency repair. The repair was carried out by CS Niwa between 0940 on 19 January and 1030 on 4 February 2014, a total repair voyage time of 16.083 days, including mobilization, demobilization, and anti-piracy security requirements.  The faults were reported by the cable ship close to the presumed fault location, in about 16 meters water depth.

10.     The Final Repair Report (RN 01/2014) issued by the cable ship operator E-Marine recovered and photographed the armored cable with severe damage in two sections of cable consistent with anchor damage. Photographs of the recovered cable show the armored cable with kinks, smashed and parted armor wiring, and "bird cage" damage. A true copy of the Final Repair Report RN 01/2014 is attached as Exhibit 1 to this complaint.

11.     A review of publically available Automatic Information System (AIS) data transmitted by the MSC Maya and recorded by shore receivers shows the MSC Maya in various positions in the vicinity and over TGCS at the approximate time and date that damage occurred. A Lloyd's Intelligence AIS report for 1517 to 1806 on 6 January 2014, with 9 updates, shows the vessel in the vicinity of the Jebel Ali anchorage at 25° 04.17' N and 54° 50.39' E with a speed over ground of 1.8 knots approaching the Jebel Ali Anchorage which is noted as 2.5 nautical miles distance away.  Later the cable is enmeshed by MSC Maya AIS data points **#57** (1734-25.078583°N [25°4.715' N]; 54.843983° E [54°50.64' E], speed 1.4 knots, course 225°) and **#58** (1736-25.078° N [25°4.6'N]; 54.84292°E [54°50.58' E], speed 1.5 knots, course 270°.)  A true copy of the Lloyd's Intelligence AIS Report is attached to this as Exhibit 2 to this complaint.

12.     Eight contemporaneous AIS Live screen shots taken on the day of the damage (January 6, 2014) track with precision the MSC Maya's position and navigation status.  At 1329

~3~

UTC the *MSC Maya* is recorded with its navigation status "underway" approaching the Jebel Ali

Anchorage on a course of 148° and a speed of 1.1 knots. Three minutes later (1332 UTC), the

ship's navigation status changes to "at anchor" with a speed of .5 knots on course 159° At 1643

UTC the ship crosses into the cable zone (an area .5 nautical miles on either side of the cable as

marked by a magenta wavy line on the nautical chart), "at anchor" with a speed of 3.2 knots on a

course of 218°. At 1704 the ship is directly over the cable at a speed of 1.2 knots and a course of

218°. At 1716 UTC the ship's speed slows to .7 knots on a course of 255°. At 1733 ITC the ship

is still "an anchor" with a speed of 1.4 knots and a course of 225°. The next screen shot shows no

other vessels except MSC Maya in a zone .5 nautical miles on either side of the cable. Finally, at

1756 UTC, the ship and its dragging anchor is shown with a speed of 1.4 knots on a course of

196°. True copies of the screen shots referred to herein at contained in Exhibit 3 to this complaint.

13.     These AIS positions and the time brackets that contain them have the ship

crossing TGCS at the time communication was lost on the cable in a manner consistent with

anchor dragging. AIS data records the ship while "at anchor" crossing the TGCS cable at least

three times. The ship crossed the cable at 1704; then doubled back over the cable to the north

again at 1716. The ship then crossed the cable moving south one again and at 1732 was heading

away at the approximate time communications was lost on the cable. The position of faults and

their displacements from their prior "as laid" cable position is consistent with contact by the

MSC Maya's anchor as it dragged back and forth over the cable along the seabed. AIS data

shows no other ships are close to the fault that could have caused the damage.

14.     TGCS is shown on UK Admiralty Chart BA 3739 [Jebel Ali Mina Jabal Ali and

Approaches] with a magenta wavy line, the standard IHO designation for an active submarine

~4~

cable.  A true copy of the relevant portion of BA 3739 is attached as Exhibit 4 to the complaint.

The chart also carries the following warning in magenta:

*"SUBMARINE CABLES"*

***Mariners are advised not to anchor or trawl in the vicinity of submarine cables.***

     15.       The prudent seamanship practice is spelled out in the *Mariner's Handbook,* an

official British government navigational publication. A true copy of the relevant page from the

Mariner's Handbook is attached as Exhibit 5 to the complaint:

> General Information
> 3.121
>
>       Modern long-distance telephone cables are fitted with submarine repeaters at frequent intervals to improve clarity; the repeaters contain components designed to function unattended for 25 years at depths of 3 miles or more.  **Damage to these cables or their equipment can be costly and can cause extensive disruption of international communications.**
>       **Every care should therefore be taken to avoid anchoring, trawling, fishing, dredging, drilling, or carrying out any other activity in the vicinity of submarine cables which might damage them.  Damage to a submarine cable can lead to prosecution where it can be shown to be done willfully or through neglect.**
>
> Caution
> 3.122
>
>       If a vessel fouls a submarine cable, every effort should be made to clear the anchor gear by normal methods, taking care to avoid any risk of damaging the cable.  If these efforts fail, the anchor or gear should be slipped and abandoned.  No attempt should be made to cut the cable. Serious risk exists of loss of life due to electric shock, or at least severe burns, if any such attempt is made.
>
>       No claim in respect of injury or damage sustained through such interference with a submarine cable is likely to be entertained.

     16.       Chart BA 3739 also shows the very large designated anchorage area well

marked near the fault locations which are located to the south and outside of the designated

anchorage area. The transit or drifting of the MSC Maya back and forth over the charted cable

~5~

outside of the charted anchorage area to an area near two active submarine cables where the master decided to anchor or where the master failed to set an adequate anchor watch to detect dragging demonstrates a lack of care in seamanship and in navigating and anchoring the ship. Had the vessel stayed in the designated anchorage area, it would have never come in contact with charted cable with its anchor.

17. Tata has sustained damages in carrying out the emergency repair of the cable in the amount of $975,177.79. These damages include the costs paid by the plaintiff to charter the repair ship CS Niwa, including its fuel, mobilization and demobilizations charges, pilot and harbor charges, Remotly Operated Vehicle (ROV), security team, and contract charges by the repair ship owner, replacement cable, and universal jointing kits for splicing. These damages are broken down in the table attached as Exhibit 6 to the complaint.

18. TGCS is protected status under the International Convention for Protection of Submarine Cables, 24 Stat. 989 (Dec. 1, 1886); 25 Stat. 1424 (July 7, 1887); TS 380, Mar. 1884) ("Cable Convention"), articles 2 ["The breaking or injury of a submarine cable, done wilfully or through culpable negligence, and resulting in the total or partial interruption or embarrassment of telegraphic communication, shall be a punishable offense but the punishment inflicted shall be no bar to a civil action for damages"], The Geneva Convention on the High Seas,( 29 April 1958) ("Geneva High Seas Convention")450 UNTS 11, article 27 ["Every State shall take the necessary legislative measures to provide that the breaking or injury by a ship flying its flag or by a person subject to its jurisdiction of a submarine cable beneath the high seas done wilfully or through culpable negligence, in such a manner as to liable to interrupt or obstruct telegraphic or telephonic communications. . .shall be a punishable offense."] and the United Nations Convention on the Law of the Sea (10 Dec. 1982), 1833UNTS 3, ("UNCLOS"), article 113

~6~

["Every State shall adopt the laws and regulations necessary to provide that the breaking or injury by a ship flying its flag or by a person subject to its jurisdiction beneath the high seas done wilfully or through culpable negligence, in such a manner as to be liable to interrupt or obstruct telegraphic or telephonic communications . . .shall be a punishable offense."]

19.     The United States is a party to the Cable Convention and the Geneva High Seas Convention and regards UNCLOS as customary international law to which it adheres.  In compliance with its obligations, the United States enacted the Submarine Cable Act, 47 U.S.C. §§ 21 and 22 that make it a crime to injure an international submarine cable like TGCS in the manner done by the vessel interests.

20.     The actions of the vessel interests in injuring TGCS violate international law and the Submarine Cable Act and constitute negligence per se.

21.     The actions of the vessel interests in injuring TGCS constitute a maritime tort under the general maritime law.

22.     Under the general maritime law, there is a presumption of negligence when a vessel strikes a stationary object that is marked on a nautical chart.

23.     As a result of the negligence and violations of international law and the Submarine Cable Act described above, the vessel interests damaged the TGCS cable by contact from the vessel's anchor causing the damages described in this Complaint.

24.     The Plaintiff has presented its claim with supports for its damages to the vessel interests and their P&I underwriters and attorneys without success.

WHEREFORE, Plaintiff demands judgment as follows:

(a)     That process in due form of law according to the practice of this Court in causes of admiralty and maritime jurisdiction be issued against the Defendants, including the MSC

~7~

Maya, its engines, tackle, appurtenances, furniture, gear, etc, citing them to appear and answer the foregoing.

      (b)     That a decree may be entered in favor of the plaintiff and against the defendants, jointly and severally or in the alternative, for the amount of the plaintiff's damages, together with interest, costs and, if allowed, attorney's fees, and

      (c)     That the Court grant such further and other relief as it may deem just and as required by this cause of action, including attorney fees.


Dated:  New York, New York
         January 6 2016

                           Douglas R. Burnett, Esq. (DB 7616)
                           SQUIRE PATTON BOGGS
                           30 Rockefeller Plaza
                           New York, NY 10112
                           Douglas.Burnett@squirepb.com
                           (212) 872-9800

010-8177-9528/1/AMERICAS

## Verification

STATE OF NEW YORK      )
                                            ss:
COUNTY OF NEW YORK   )

Douglas R. Burnett, being duly sworn, states as follows:

I am a partner at the firm of Squire Patton Boggs (US) LLP, attorneys for the plaintiff,

herein; that I have read the foregoing Complaint and that the allegations contained therein are

true to the best of my information, knowledge and belief; and that the source of the deponents

knowledge are the reports and information received from the plaintiff, its agents, attorneys, and

public information in this action.

Douglas R. Burnett

Sworn to before me this 6th day of
JANUARY 2016

Notary Public

RUDY D. GREEN
Notary Public, State of New York
No.: 02GR4962723
Qualified in New York County
Commission Expires February 26, 2018